8:26-mj-01394-GLS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEIZURE OF THE
FOLLOWING PROPERTY:

All Bitcoin (BTC) held in the Kucoin accounts
associated with Kucoin User IDs:

168896610 (TARGET ACCOUNT 1);
168896835 (TARGET ACCOUNT 2);
174143274 (TARGET ACCOUNT 3)

Case No. ___8:26-mj-01394-GLS___

_____ FILED   _____ ENTERED
_____ LOGGED   _____ RECEIVED

AUG 11 2026

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Laura J. Steinbach, being duly sworn, depose and state:

### INTRODUCTION AND AGENT'S BACKGROUND

1. I am "an investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2516.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other FBI personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2014. I am currently assigned to a squad in the Baltimore Division responsible for investigating complex financial crimes such as mail fraud, wire fraud, financial institution fraud, and money laundering. I have prepared and executed multiple search, arrest, and seizure warrants. As a federal agent, I am authorized to investigate violations of laws of the United

States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

4.      This affidavit is made in support of an application for a warrant authorizing the seizure of Bitcoin ("BTC"), from the following Kucoin ("Kucoin") accounts (collectively the "TARGET ACCOUNTS"), as proceeds of wire fraud, in violation of 18 U.S.C. §§ 1343 and involved in money laundering, in violation of 1956(a)(1)(B)(i), and therefore subject to criminal and civil forfeiture:

**"TARGET ACCOUNT 1":**

- **KUCOIN USER ID:** 168896610

- **NAME:** Not provided

- **ASSOCIATED EMAIL ADDRESS:** frankm41022@gmail.com

**"TARGET ACCOUNT 2":**

- **KUCOIN USER ID:** 168896835

- **NAME:** Not provided

- **ASSOCIATED EMAIL ADDRESS:** grim78584@gmail.com

**"TARGET ACCOUNT 3":**

- **KUCOIN USER ID:** 174143274

- **NAME:** Not provided

- **ASSOCIATED EMAIL ADDRESS:** eva653651@gmail.com

### APPLICABLE LAW

5.      This Court has jurisdiction to issue the requested warrants to seize property in the **TARGET ACCOUNTS** because it is proceeds of wire fraud, in violation of 18 U.S.C. § 1343, and involved in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and as such is

subject to criminal and civil forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(a) (criminal forfeiture), and 18 U.S.C. § 981(a)(1) (civil forfeiture).

6.     Title 18, United States Code, Section 1343 (wire fraud) provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice," shall be guilty of a federal offense.

7.     Title 18, United States Code, Section 1956(a)(1)(B)(i) (laundering of monetary instruments with intent to conceal) provides that "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" shall be guilty of a federal offense. Wire fraud is a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1).

8.     The proceeds of wire fraud are subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to civil forfeiture. In addition, 28 U.S.C. § 2461(c) provides that "if a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized," then the government can obtain a forfeiture of property "as part of the sentence in the criminal case." Thus, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or

personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to criminal forfeiture.

9.    Property involved in a money laundering offense is subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to civil forfeiture. In addition, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to criminal forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime. These forfeitures encompass all property "involved in" the crime, which includes the actual property laundered and property used to facilitate the laundering offense, including co-mingled funds. *See United States v. McKinney*, No. 07-0113-01 (RBW), 2009 WL 10701319 at *7 (D.D.C. Mar. 26, 2009) ("property that may be used to facilitate a money laundering violation includes money in financial accounts, personal property, real property, and businesses"); *see also United States v. Wyly*, 193 F.3d 289, 302 (5th Cir. 1999) (explaining that untainted funds that are comingled with tainted funds derived from illicit sources may constitute a facilitating property).

10.    This application seeks a seizure warrant under both civil and criminal authority because the property to be seized could otherwise be placed beyond the government's reach. Pursuant to 18 U.S.C. § 981(b), property subject to civil forfeiture may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement," if there is probable cause to believe that the property is subject to

forfeiture. Pursuant to 28 U.S.C. § 1355(b), a forfeiture action may be brought in any district court where any of the acts giving rise to the forfeiture occurred, even as to property located in a foreign jurisdiction. The criminal forfeiture statute, 18 U.S.C. § 982(b)(1), incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for a criminal forfeiture action. Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

## PROBABLE CAUSE

### Background on Relevant Cryptocurrency Entities and Concepts

#### Cryptocurrencies and Transaction Analysis

11.     Cryptocurrencies, also known as virtual currency, are not tied to any nation's fiat currency. The owner of cryptocurrency is assigned a mathematical encryption key pair, consisting of a "public key" and a "private key," with which to control the currency they own. The public key is also known as an "address," is visible to the public, and allows members of the public to verify the owner of virtual currency and other information. Addresses are also used to send and receive cryptocurrency. Wallets are software programs that interface with blockchains and generate and/or store the public addresses and private keys used to send and receive cryptocurrency. A "wallet" can hold multiple addresses for a user, and an "account" can hold multiple wallets for a user. Users can transfer cryptocurrency into a wallet and the cryptocurrency may be housed in any of the addresses within the wallet. The private key, also known as a "secret key," is essentially a password used to execute cryptocurrency transactions. Secret keys are typically only shared with the owner of the address.

12.     Cryptocurrency transactions can have multiple inputs and multiple outputs. While the ownership of any particular address or wallet can be anonymous, all transactions of

cryptocurrencies are recorded on a "blockchain," which is a series of "blocks" of transactions that establishes a verifiable, transparent record of the movement of virtual currency. Blockchains in this context are viewable by the public; they show all transactions, but do not reflect who owns a particular address. As cryptocurrency transactions are processed, they are assigned a unique identifier on the blockchain called a transaction hash.

13.     Cryptocurrency exchanges exist and operate similarly to fiat currency exchanges. Customers use these exchanges to trade one form of digital currency for another, or to exchange digital currency into fiat money. In my training, knowledge, and experience, fraudsters will use cryptocurrency exchanges to launder or obfuscate their illicit gains.

14.     Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, financial account information, including cryptocurrency wallets, is not typically shared across multiple, unrelated individuals. I also know that this shared use of information is very often the same person or a close and trusted group working in concert.

15.     Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, I know that cryptocurrency can be laundered through multiple wallets and accounts in a manner that is similar to the laundering of fiat currency through different banks and bank accounts. However, with cryptocurrency the laundering transactions have the potential to be done in a faster and more efficient manner than through banking institutions. Fraudsters may attempt to obtain money from victims in the form of cryptocurrency because of its efficiency to be transferred from the United States and laundered through cryptocurrency accounts maintained by people and fraudsters outside of the United States.

16.    **Bitcoin:** "Bitcoin" ("BTC") is a type of cryptocurrency. Bitcoin was the first decentralized cryptocurrency developed.

17.    **Kucoin:** KuCoin is a cryptocurrency exchange based in the Seychelles. According to information provided on KuCoin's website, users can exchange, buy, sell, and trade Bitcoin and other cryptocurrencies.

## The Investigation

18.    The FBI is investigating the loss of funds that was fraudulently obtained from "Victim 1" who resides in Bethesda, Maryland. Based on the investigation to date, your Affiant believes Victim 1 is the victim of a government impersonation scam.

19.    On or about July 1, 2022, Victim 1 was contacted by an individual who identified himself as "Agent Robert Marshall, federal badge number 201347". "Marshall" informed Victim 1 that Victim 1's identity had been stolen and an account associated with Victim 1's social security number (SSN) was used to send $120,000 to Columbia and Mexico. "Marshall" further informed Victim 1 that someone attempted to set up six to seven additional accounts using her SSN. "Marshall" advised Victim 1 that she could not discuss the case with anyone and that Victim 1's information had been forwarded to the US Treasury Department.

20.    "Marshall" put Victim 1 in touch with "Officer James Anderson" who was a "Senior Investigator, badge number IDT 56142". "Anderson" told Victim 1 that her identity was compromised and that five different accounts were opened under her SSN. "Anderson" also informed Victim 1 that wire transfers totaling $280,000 were initiated from accounts associated with Victim 1's SSN that should have been reported to the IRS. As a result of the wire transfers, "Anderson" advised Victim 1 that she was considered a subject of a money laundering investigation and needed to take action to obtain a new SSN.

21.    In order to defend herself in the money laundering case and to obtain a new SSN, "Anderson" informed Victim 1 that she could enroll in a standard program sponsored by the government. Participating in the program would allow Victim 1 to obtain a new SSN and defend herself in the money laundering investigation without having to hire an attorney and navigate through the legal system.

22.    To participate in the standard program, Victim 1 was required to transfer funds to a purported government account. Specifically, "Anderson" told Victim 1 that before a new SSN could be issued, Victim 1's financial accounts had to be "cleared" through wire transfers and bitcoin transactions. Victim 1 was told that she would receive her money back plus interest. Victim 1 sent funds from her bank accounts as well as her retirement accounts. Victim 1 was told to text "Anderson" twice a day to keep the investigation open.

23.    On July 6, 2022, "Anderson" referred Victim 1 to his supervisor "Ian Bishop" because he claimed Victim 1's case was "complicated". "Bishop" told Victim 1 that he was from the "US Treasury, Identity Theft Division, badge number IRM 2028." "Bishop" had a slight accent that Victim 1 could not decipher. "Bishop" used the email address ianbtreasury@usa.com. Victim 1 began to transfer her funds to these fraudsters, and "Bishop" guided Victim 1 through approximately 19 bank wire transfers and 45 Bitcoin transactions.

24.    Victim 1 withdrew funds from her investment accounts in order to fund the wire transfers and bitcoin transactions. Victim 1 also established five or six bank accounts at the direction of the fraudsters in order to send the funds.

25.    When Victim 1 went to the banks to conduct the wire transfers, "Bishop" insisted that Victim 1 stay on the phone with him before, during, and after she conducted the transfers.

"Bishop" did not speak when Victim 1 was inside of the bank. Victim 1 was told to tell the bank employees who questioned the nature of the wires that she was establishing a business.

26. At one point in time when Victim 1 needed to travel outside of the United States, Victim 1 was "required" to receive permission from the "Attorney General" in order to go on her trip. "Bishop" emailed Victim 1 a template of a request to send to the "Attorney General" and told Victim 1 to email the request. However, the template "Bishop" sent was written in poor English, so Victim 1 needed to modify the template before emailing it to the "Attorney General".

27. Victim 1 also received fictitious letters from the "DC Attorney General" and the "IRS" during the fraud scheme.

28. On or about March 13, 2023, Victim 1 planned to receive two individuals from the "Maryland State Department" at her home that would provide Victim 1 with a new SSN and conduct a "counseling session" with Victim 1 regarding the status of her funds. Victim 1 asked her son to come to her home on the day of the counseling session in order to be a second set of ears. However, no one ever came to Victim 1's home as planned. At that time, Victim 1's son informed her that he believed she had been scammed and took Victim 1 to the police station to file a report. Victim 1 had not informed her son of anything that occurred prior to that date. Victim 1 also filed a complaint with the FBI at that time.

29. Victim 1 drained all of her investment accounts as a result of the fraud. Victim 1 estimates that she gave the fraudsters approximately $2,097,608.00 directly through bank transfers and cryptocurrency transactions.

## Cryptocurrency Tracing Analysis

30. Victim 1 provided a receipt from an Unbank bitcoin ATM transaction conducted on December 21, 2022. The receipt indicates Victim 1 deposited $25,000 and sent 1.29 BTC to

address bc1qm9y0xj32z3mgyucevevsca3upjaxeks66cxlng.  Victim 1's funds were then sent to address 175vmXfxB5VLmgmXAB7MbAqX34afgSs55f.  Later that same day, 1 BTC of Victim 1's funds was sent to **TARGET ACCOUNT 1** at Kucoin cryptocurrency exchange, at address bc1qha469njlgy20tj9sadz6f488ym3pc90d72gv4k.  These funds remained in the account until Kucoin voluntarily froze the funds.  A visual depiction of the movement of funds is as follows:



31.    Since the final BTC deposit into **TARGET ACCOUNT 1** on December 21, 2022, no other deposits or withdrawals were made into or out of **TARGET ACCOUNT 1**.

32.    Victim 1 provided another receipt from a second Unbank Bitcoin ATM transaction conducted on January 30, 2023. The receipt indicated victim 1 deposited another $25,000 and sent 0.94 BTC to address bc1qaw97dwt3lp7znmecycqlr3hcfeguwnx3ghmxyj. Victim 1's funds were then sent to address bc1qysz2njmg0y3zf88snp67649wjnqqwddd6374n9. Later that same day, 0.94 BTC of Victim 1's funds were sent to **TARGET ACCOUNT 2** at Kucoin cryptocurrency exchange, at address bc1qhnrtsgj9g74n6pa65hnppq74aqlnkskeav6mv0. These funds remained in the account until Kucoin voluntarily froze the funds. A visual depiction of the movement of funds is as follows:



33.    Since the final BTC deposit into **TARGET ACCOUNT 2** on January 30, 2023,

no other deposits or withdrawals were made into or out of **TARGET ACCOUNT 2**.

34.    Victim 1 provided a receipt from a third Unbank Bitcoin ATM transaction

conducted on February 9, 2023. The receipt indicated Victim 1 deposited yet another $25,000

and sent 0.97 BTC to address bc1qugjk67dgf74elp7dgx0jq6fy2vycmrmy84ly58. Later that same

day, Victim 1's funds were then sent to address

bc1qfd3ctmt5mzxwzu7zekflja87vtxd58hetq5uv3. On February 10, 2023, in a series

transactions, a total of 0.74 BTC originating from Victim 1 were sent to **TARGET ACCOUNT**

**3** at Kucoin cryptocurrency exchange, at address bc1qt5l4ek5kwaxplufaqstfu2peaf4jll480g8mqq.

A visual depiction of the movement of funds is as follows:



35.    On February 10, 2023, Victim 1's BTC was exchanged for USDT and withdrawn from **TARGET ACCOUNT 3**. Only one other transaction occurred after Victim 1's funds were withdrawn. On February 16, 2023, approximately 0.2 BTC was deposited into **TARGET ACCOUNT 3**. The source of these funds were two Bitcoin ATM deposits which occurred on February 16, 2023. Cash deposits of approximately $6,000 and $3,000, respectively, were used to purchase 0.29 BTC, which were sent to address bc1qqn2anyhphyvdeguwl7yknlrxnrcu9nw68t0sgl. These funds were then sent to address bc1qdwheydp7rs9az8n52vqu78fdxpxlrg5kwxa6fq. Later that same day, 0.2 BTC of those funds were sent to **TARGET ACCOUNT 3**. Those funds remain in **TARGET ACCOUNT 3** and no subsequent deposits or withdrawals have been made in the intervening period.

36.    Although the funds traceable to Victim 1 were withdrawn from **TARGET ACCOUNT 3**, the subsequent deposit shares the same set of facts: deposits made to a Bitcoin ATM, followed by an immediate circuitous laundering pattern before being deposited into **TARGET ACCOUNT 3**. Further, in my training and experience, a cryptocurrency account used for illicit purposes is virtually never subsequently used for legitimate purposes.

## CONCLUSION

37.    This affidavit seeks seizure of all BTC contained in the **TARGET ACCOUNTS**. Based on my training and experience, I know individuals engaged in fraud often move proceeds of criminal activity through multiple financial accounts, sometimes at a rapid pace, and often with no discernable legitimate purpose with the goal of concealing the true nature and source of the underlying funds. The blockchain analysis in this case demonstrates this; it shows the movement of the victim money, broken up and distributed through a series of transactions, without any apparent legitimate economic purpose, which implies the purpose of the transactions was to

conceal the nature, source, location, ownership and control of the proceeds. *See, e.g., United States v. Rodriguez*, 53 F.3d 1439, 1447-48 (7th Cir. 1995) (convoluted real estate transactions, from which intent to conceal or disguise may be inferred, also imply knowledge of illegal source). In addition, even if the source of some of the funds in the **TARGET ACCOUNTS** cannot be conclusively shown, because the **TARGET ACCOUNTS** contain illicit funds, and those funds having passed through multiple accounts, your affiant respectfully submits that all funds in the **TARGET ACCOUNTS** are involved in money laundering, and therefore subject to seizure.

38.    Based on the forgoing, I submit that there is probable cause to believe that all BTC held in the **TARGET ACCOUNTS**, in any form, are proceeds of wire fraud, in violation of 18 U.S.C. §1343, and/or are involved in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i)(Concealment Money Laundering), and therefore subject to criminal and civil forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1).


39.    Further, because the requested warrants would be executed by serving electronically to Kucoin, I respectfully submit that there is good cause to permit the execution of the warrants at any time, day or night.

Special Agent Laura Steinbach
Federal Bureau of Investigation


Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this _____29th_____ day of June 2026.

The Honorable Gina L. Simms
United States Magistrate Judge

## ATTACHMENT A: PROPERTY TO BE SEIZED

Pursuant to this warrant, Kucoin shall provide the law enforcement officer/agency serving this document with the equivalent amount of BTC tokens that are currently associated with the Kucoin user IDs referenced below. Kucoin shall effectuate this process by transferring the BTC tokens to a U.S. law enforcement-controlled virtual currency wallet. Kucoin shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate its implementation.

- **168896610 (TARGET ACCOUNT 1);**
- **168896835 (TARGET ACCOUNT 2);**
- **174143274 (TARGET ACCOUNT 3)**

## ATTACHMENT B: SEIZURE PROCEDURE FOR THE TARGET ACCOUNTS

The foregoing establishes probable cause to believe that the funds held in the **TARGET ACCOUNTS** are subject to civil and criminal forfeiture.

Should this seizure warrant be granted, law enforcement intends to work with Kucoin to seize the funds associated with the **TARGET ACCOUNTS**. In sum, the accompanying warrant would be transmitted to Kucoin, at which time Kucoin would assist in transferring the BTC balance in each of the **TARGET ACCOUNTS** to a public cryptocurrency address controlled by the United States.

Items to be seized would include any and all BTC, to include the following:

a. any and all representations of cryptocurrency public keys or addresses;

b. any and all representations of cryptocurrency private keys, whether in electronic or physical format;

c. any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "root keys" which may be used to regenerate a wallet.

The United States is authorized to seize any and all BTC by transferring the full BTC balance in each of the **TARGET ACCOUNTS**.

The seized currency will remain in the custody of the U.S. government during the entire pendency of the forfeiture proceedings, to ensure that access to, or manipulation of, the forfeitable property cannot be made absent court order or, if forfeited to the United States, without prior consultation by the United States.